# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANTOINE WIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-148-GMS |
| | ) | |
| STATE OF DELAWARE, | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |

## STATE OF DELAWARE'S
## BRIEF IN SUPPORT OF ITS
## <u>MOTION TO DISMISS</u>

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

Laura L. Gerard (DE I.D. #3202)
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendant

Dated: May 15, 2006

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      The State of Delaware, Department of Transportation is
        immune from money damages under the Eleventh
        Amendment of the United States Constitution, in accordance
        with *Board of Trustees of the Univ. of Alabama v. Garrett*. . . . . . . 6

II.     Plaintiff fails to state a claim upon which relief can be granted. . . . 8

        A.      Plaintiff was not "disabled" for purposes
                of the Americans with Disabilities Act. . . . . . . . . . . . . . . . . 8

        B.      Alternatively, if Plaintiff was insulin-dependent as
                Alleged, Plaintiff was not a "qualified individual"
                for purposes of the Americans with Disabilities Act. . . . . . . 9

        C.      There is no nexus between Plaintiff's alleged disability
                and the adverse employment decision. . . . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Beaulieu v. Northrop Grumman Corp.*, 161 F.Supp.2d 1135
    (D. Hawaii 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Board of Trustees of the Univ. of Alabama v.*
    *Garrett*, 531 U.S. 356 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 7

*Borkowski v. Valley Central School Dist.*, 63 F.3d 131 (2d. Cir. 1995) . . . 10

*Carlson v. Rent-A-Center, Inc.,* 237 F.Supp. 114 (D. Maine 2003) . . . . . . 8

*Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576 (3d Cir. 1998) . . . . . . . . 10

*Lavia v. Comm. of Pennsylvania*, 224 F.3d 190 (3d Cir. 2000) . . . . . . . . . 6

*Lieberman v. State of Delaware*, 2001 WL 1000936
    (D.Del. Aug. 30, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Maull v. Div. of State Police*, 141 F.Supp.2d 463 (D.Del. 2001),
    *aff'd*, 2002 WL 1480774 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 6

*Moore v. Time Warner GRC* 9, 18 F.Supp.2d 257 (W.D.N.Y 1998) . . . . . 8, 10

*Siefken v. Village of Arlington Heights*, 65 F.3d 664, 667 (7th Cir. 1995) . . 11

*Thompson v. Eaton Corp.*, 2002 WL 31995670 (W.D. WI) . . . . . . . . . . . 8

*Turner v. Hershey Chocolate USA*, 440 F.3d 604 (3d Cir. 2006) . . . . . . . . 8, 9, 10

**Statutes and Regulations**

42 *U.S.C.* § 12102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 *U.S.C.* § 12111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9

42 *U.S.C.* § 12112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

29 C.F.R. § 1630.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

49 C.F.R. § 391.41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

17 *Del.C.* Ch. 1 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Page(s)**

**<u>Rules</u>**

Fed.R.Civ.Proc. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8

## <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

Plaintiff Antoine Wiggins ("Wiggins" or "Plaintiff") filed suit against the State of Delaware, Department of Transportation ("Defendant"). In his complaint, Mr. Wiggins alleges he was employed by Defendant as a bus driver beginning 1999, and was diagnosed with Type II diabetes, meaning he was insulin dependent, in 2002. D.I.1, ¶ 4, 5. He claims Defendant pre-approved him for intermittent leave under the Family Medical Leave Act ("FMLA") for periodic side effects that would temporarily disable him from work. D.I.1, ¶ 7, 8. Mr. Wiggins alleges he failed to call out sick on November 9 and November 11, 2002, allegedly due to side effects of his Type II diabetes which rendered him unable to work for several days, which resulted in his dismissal from employment on November 21, 2002. D.I. 1, ¶ 10, 11. He seeks back pay, front pay, lost benefits, punitive, liquidated and compensatory damages and reinstatement, for an alleged violation of the Americans with Disabilities Act. D.I. 1, ¶ 13.

Defendant is filing this Motion to Dismiss the Complaint in lieu of filing an Answer.

## SUMMARY OF ARGUMENT

The State of Delaware and its agencies are immune from money damages under the Eleventh Amendment in suits brought under the Americans with Disabilities Act ("ADA" or "Act") in Federal courts.   *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001) is dispositive on this issue.

Plaintiff fails to state a claim upon which relief can be granted.   Fed. R. Civ. Pro.12(b)(6). Plaintiff is not "disabled" or, alternatively, is not a "qualified individual," within the meaning of the Americans with Disabilities Act.   If Plaintiff can hold a commercial drivers license ("CDL"), which is a job requirement, he is not disabled.   If Plaintiff is disabled, he cannot hold a CDL and is not a qualified individual under the Act. Last, Plaintiff fails to show that his dismissal was as a result of his alleged disability from Type II diabetes.   Rather, Plaintiff's dismissal occurred because he failed to report to work as scheduled or otherwise failed to call in to the employer, as required under the terms of a collective bargaining agreement.

For the reasons above, Plaintiff's Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

On January 12, 2000, Antoine Wiggins became employed as a fixed route bus operator.[1] Fixed route bus operators are represented by Local 842 Amalgamated Transit Union AFL-CIO ("ATU"), and the conditions of the bus operators' employment are subject to the terms of a collective bargaining agreement. The collective bargaining agreement in place during Mr. Wiggins' employment included a grievance process for disciplinary actions and termination. This process includes various steps, from Step 1 which is an informal meeting, to Step 4 which is binding arbitration as determined by an independent arbitrator, in order to resolve grievance disputes.

Fixed route bus operators are expected to report for scheduled work, by either showing for their shift or calling Dispatch to inform they will be absent.[2] Failure to report -- either by failing to show for work or failing to call Dispatch -- is a "miss" under the collective bargaining agreement. Progressive discipline is imposed for misses based upon a floating 12 month period; a seventh miss results in termination of employment.

Mr. Wiggins incurred various misses within a 12-month floating period, including: June 4, 2001 (1st miss); November 13, 2001 (2nd miss); November 17, 2001 (3rd miss); and January 8, 2002 (4th miss).[3]

---

[1]  Mr. Wiggins' employment was initially as a part-time operator; full-time employment as a fixed route operator became effective November 6, 2000.

[2]  Fixed route operators are able to take an absence, also known as an "occurrence," from work instead of incurring a "miss," by simply calling Dispatch to inform they will be absent from work.

[3]  In addition to "misses," several absences or "occurrences" were also incurred in 2001 and 2002. Also, during his employment and per his request, Mr. Wiggins received leave under the Family Medical Leave Act ("FMLA") for various absences at various times.

On or about February 23, 2002, Mr. Wiggins was taken off of work because of an onset of diabetes. Based upon information and belief, he was released to return to work in May 2002 apparently without restrictions.

Several additional misses were incurred following Mr. Wiggins' return to work. On August 9, 2002, he incurred a 4th miss, and a 5th miss occurred on August 12, 2002, based upon a floating 12-month period. Mr. Wiggins did not grieve any of these missed penalties. Based upon information and belief, the immediate supervisors of Mr. Wiggins were unaware that Mr. Wiggins' failure to report was allegedly due to side effects of his diabetes. D.I. I, ¶ 7, 10.

On October 30, 2002, Mr. Wiggins underwent a medical evaluation for U.S. Department of Transportation requirements, and was issued a 1-year card due to diabetes and being on oral medication only to control his glucose levels. Based upon information and belief, Mr. Wiggins was not insulin dependent as of October 30, 2002. Had he been insulin dependent, he could not have qualified for a CDL, which is a federally-mandated requirement. 49 C.F.R. § 391.41.

A 6th miss occurred on November 4, 2002. Mr. Wiggins did not grieve this miss.

A 7th miss occurred on November 9, 2002. Mr. Wiggins was suspended without pay effective Monday, November 11, 2002 pending a pre-dismissal hearing. Following a pre-dismissal hearing on November 20, 2002, dismissal became effective November 21, 2002. Mr. Wiggins grieved this dismissal under the collective bargaining agreement, which concluded with a Step 3 hearing on January 2, 2003. Mr. Wiggins was advised of his right to appeal to Step 4, which requires union membership approval under the collective bargaining agreement, which was not forthcoming.

On or about April 6, 2006, Plaintiff's Complaint and Summons was served on DelDOT's offices at 800 Bay Road, Dover, Delaware.

## DISCUSSION

**I.  The State of Delaware, Department of Transportation is immune from money damages under the Eleventh Amendment of the United States Constitution, in accordance with *Board of Trustees of the Univ. of Alabama v. Garrett*.**

The Eleventh Amendment to the United States Constitution immunizes States from suits brought by citizens in Federal courts.  Although the States may be sued in Federal court to enforce the Fourteenth Amendment and may consent to suit by voluntarily waiver, the States may not be compelled to submit to Federal courts in other matters.

Defendant is immune from suit under the Americans with Disabilities Act, 42 U.S.C. §§ 12111, 12112, for money damages. *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 360 (2001); *Maull v. Div. of State Police*, 141 F.Supp.2d 463, 471 (D.Del. 2001), *aff'd*, 2002 WL 1480774 (3rd Cir. 2002); *Lieberman v. State of Delaware*, 2001 WL 1000936 (D.Del. Aug. 30, 2001) (Exhibit 1). Defendant has not consented to suit by any "clear declaration" that it intends to submit to the jurisdiction of Federal courts for purposes of the Americans with Disabilities Act.

*Garrett* is dispositive for Defendant. In *Garrett*, employees sued trustees of the state university and the Alabama Department of Youth Services for alleged violations of the Americans with Disabilities Act, 42 U.S.C. § 12112(a), seeking money damages.[4] One plaintiff who suffered from chronic asthmas and sleep apnea, requested the Department to modify his duties to minimize his exposure to carbon monoxide and

---

[4]  Title II of the ADA deals with the "services, programs, or activities of a public entity." 42 U.S.C. § 12132. Because Mr. Wiggins was previously employed and is, in part, seeking reinstatement, Defendant presumes he is alleging a violation under Title I, not Title II, of the ADA. *Garrett*, 531 U.S. at 360, n. 1. Assuming, *arguendo*, that a violation under Title II of the ADA is alleged, Defendant relies upon the cases of *Garrett*, *supra*, *Lieberman*, *supra*, and *Lavia v. Comm. of Pennsylvania*, 224 F.3d 190 (3d Cir. 2000).

6

cigarette smoke and to be reassigned to daytime shifts to accommodate his conditions; the Department granted none of the requested relief. The other plaintiff, who took substantial leave from work for cancer treatment, was given a lower paying position upon returning to work.

The ADA prohibits employers, including the States, from "discriminat[ing] against a qualified individual with a disability because of the disability of the individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. §§ 12112(a), 12111(2), (5), (7). The Act requires employers to "mak[e] reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A) (emphasis added). The burden is on the employee to inform the employer of his medical limitations.

The Court in *Garrett* held that State employees are barred by the Eleventh Amendment for recovering money damages by reason of a State's alleged failure to comply with the provisions of Title I of the ADA. *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. at 360.

Like *Garrett* and the Alabama Department of Youth Services in that case, Defendant here has not consented to suit and is immune. Defendant is an agency of the State of Delaware that exercises various governmental functions. *See, e.g.*, Title 17, Chapter 1 *et seq.*, *Delaware Code*. Plaintiff fails to allege or offer evidence that

Defendant, as a State agency, consented to suit.   Absent evidence of a "clear declaration" of consent, Plaintiff's suit for money damages for alleged violations of the Americans with Disabilities Act must be dismissed.

## II.     Plaintiff fails to state a claim upon which relief can be granted.

Plaintiff fails to state a claim upon which relief can be granted.   Fed. R. Civ. Pro.12(b)(6). To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must establish that he (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an adverse employment action because of that disability. *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006).  Defendant contests all three elements.

### A.     Plaintiff does not have a "disability" for purposes of the Americans with Disabilities Act.

Under the ADA, an actionable disability is defined in part as a "physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(2)(A). Type II Diabetes, or Adult Onset Diabetes, is rarely insulin-dependent and generally treated by lifestyle changes and oral medications. Various courts have determined that non-insulin dependent diabetes may not qualify as a "disability" under the ADA. *See, e.g., Carlson v. Rent-A-Center, Inc.,* 237 F.Supp. 114 (D. Maine 2003) (plaintiff with non-insulin dependent diabetes and leg circulatory problems not disabled within meaning of ADA); *Thompson v. Eaton Corp.*, 2002 WL 31995670 (W.D. WI) (Exhibit 2)  (plaintiff with non-insulin dependent diabetes not disabled); *Moore v. Time Warner GRC* 9, 18 F.Supp.2d, 257, 260. n. 3 (W.D.N.Y 1998) (non-insulin dependent diabetes qualifies as disability only if it meets criteria).

As of October 30, 2002, Plaintiff was medically evaluated and noted to be taking oral medications – not insulin -- to control his glucose levels. This was 11 days before the 7th time Plaintiff failed to report, which was the basis for his dismissal.

**B.     Alternatively, if Plaintiff was insulin-dependent as alleged, Plaintiff was not a "qualified individual" for purposes of the Americans with Disabilities Act.**

Assuming, *arguendo*, that Plaintiff can establish that his diabetes rises to the level of a "disability," in other words, that he is insulin-dependent, he must also establish that he is "otherwise qualified" to serve in the position of a fixed route operator, in order to be protected under the ADA. *Beaulieu v. Northrop Grumman Corp.*, 161 F.Supp.2d 1135, 1144 (D. Hawaii 2000). However, this is problematic because if Plaintiff was insulin-dependent, as alleged (D.I.1, ¶ 4, 5), Plaintiff could not be "otherwise qualified" as he would have been precluded from obtaining a commercial drivers license ("CDL"). 49 C.F.R. § 391.41.

A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Turner v. Hershey Chocolate USA*, 440 F.3d at 611 (*citing* 42 U.S.C. § 12111(8)). This inquiry is divided into two questions: (1) whether the individual has the requisite job skill, experience, education and other job-related requirements of the position sought; and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. *Turner, supra*, at 611 (*citing* 29 C.F.R. § 1630.2(n)).  A qualified individual for the position of a fixed-route bus operator must have a CDL, which is denied under federal regulations to someone who is insulin dependent. 49 C.F.R. § 391.41.

The determination of whether an individual with a disability is qualified is made at the time of the employment decision. *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). Contrary to the assertion that he was "insulin-dependent" (D.I. 1, ¶ 4, 5), Plaintiff was noted to be taking oral medication to control glucose levels as of October 30, 2002. He was medically qualified to have a commercial drivers license, albeit only a one-year certificate and therefore, was not disabled under the Act.

Therefore, if the Plaintiff was insulin-dependent and as such, disabled under the Act, he could not be "qualified." However, if Plaintiff was a qualified individual and can hold a CDL, he was not disabled under the Act. Either way, Plaintiff can not make a *prima facie* case under the ADA.

### C. There is no nexus between Plaintiff's alleged disability and the adverse employment decision.

Last, Plaintiff fails to show that his dismissal was as a result of his alleged disability. *Turner v. Hershey Chocolate USA*, 440 F.3d at 611. Rather, Plaintiff's dismissal occurred because he failed to report to work as scheduled or otherwise failed to call in, as required under the terms of a collective bargaining agreement.

An employee has the burden to inform his employer of his alleged disability, his need for assistance and to suggest a reasonable accommodation. *Borkowski v. Valley Central School Dist.*, 63 F.3d 131, 139-141 (2d. Cir. 1995). "It is the responsibility of the individual with a disability to inform the employer that an accommodation is needed … [*b*]*efore* the challenged job action is [taken] – not after." *Moore v. Time Warner GRC 9*, 18 F.Supp.2d at 261. (citation omitted) (emphasis in original). There is no indication that Plaintiff's alleged disability prevented or made it difficult for him to call Dispatch on November 9, 2002 or the other previous misses in 2002, based upon information and

belief of Plaintiff's immediate supervisors.    Plaintiff alleges, as part of his Complaint, that he was medically unable to work November 9 – 11, 2002 (D.I. I, 10).   However, the basis for Mr. Wiggins' dismissal was not that he failed to appear for work but that he failed, for the 7th time in the past 12 months, to *call* in to work to report he would be absent November 9, 2002, as required by the collective bargaining agreement.   "[W]hen an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet 'the employer's legitimate job expectations,' due to his failure to control a controllable disability, he cannot state a cause of action under the ADA."  *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 667 (7th Cir. 1995) (citation omitted).

## **CONCLUSION**

Defendant respectfully requests this Honorable Court to dismiss the suit filed against it for the reasons set forth herein.

                                        STATE OF DELAWARE
                                        DEPARTMENT OF JUSTICE

                                        /s/ Laura L. Gerard
                                        Laura L. Gerard (DE I.D. #3202)
                                        Deputy Attorney General
                                        820 North French Street, 6th Floor
                                        Wilmington, DE 19801
                                        (302) 577-8400
                                        Attorney for Defendant

Dated: May 15, 2006

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on May 15, 2006, she caused the attached Defendant's Brief in Support of its Motion to Dismiss to be electronically filed by CM/ECF and caused to be delivered to the following persons in the form and manner indicated on May 16, 2006:

NAME AND ADDRESS OF RECIPIENT(S):

Samuel A. Dion, Esquire           Jonathan Layton, Esquire
Dion & Goldberger                 Stone Mill Office Park
1616 Walnut St.                   724 Yorklyn Rd.
Suite 2316                        Suite 100
Philadelphia, PA 19103            Hockessin, DE 19707


MANNER OF DELIVERY:

    ____      One true copy by facsimile transmission to each recipient.

  _X_      Two true copies by first class mail, postage prepaid, to each recipient.

 _____     Two true copies by Federal Express.

    ____      Two true copies by hand delivery to each recipient.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE


/s/ Laura L. Gerard
Laura L. Gerard (DE I.D. #3202)
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
Attorney for Defendant

**Westlaw Download Summary Report for GERARD,LAURA L 2234859**

| | |
|---|---|
| Date/Time of Request: | Monday, May 15, 2006 16:02:00 Central |
| Client Identifier: | LLG |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 453 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

*Westlaw.*

Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2001 WL 1000936 (D.Del.), 21 NDLR P 220
**(Cite as: Not Reported in F.Supp.2d)**

⚐
Briefs and Other Related Documents

United States District Court, D. Delaware.
Elberta Bernice LIEBERMAN, Plaintiff,
v.
The State of Delaware, and the Family Court of the
State of Delaware, Defendants.
**No. CIV. A. 96-523 GMS.**

Aug. 30, 2001.

**Background:** Family court mediation and arbitration
officer brought suit against family court and state,
alleging she failed to accommodate her disability in
violation of the Americans with Disabilities Act
(ADA) and the Rehabilitation Act. Defendants filed
motion to dismiss for lack of subject matter
jurisdiction.

**Holdings:** The District Court, Sleet, J., held that:

1(1) Congress did not validly abrogate States'
Eleventh Amendment immunity under the ADA, and

3(2) Delaware waived its Eleventh Amendment
immunity from suit under Rehabilitation Act.

Motion granted in part, and denied in part.

West Headnotes

**[1] Constitutional Law 92 ⚷243.2**

92 Constitutional Law
    92XI Equal Protection of Laws
        92k243 Creation or Discharge of Liability
            92k243.2 k. Immunity from Liability or
Suit. Most Cited Cases

**Federal Courts 170B ⚷265**

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk264 Suits Against States
                170Bk265 k. Eleventh Amendment in

General; Immunity. Most Cited Cases
Congress attempted, in language abrogating states'
Eleventh Amendment immunity in Title II of the
ADA, to impose greater obligations and
responsibilities on the states' than that which was
constitutionally mandated by the Fourteenth
Amendment. U.S.C.A. Const.Amends. 11, 14;
Americans with Disabilities Act of 1990, 42
U.S.C.A. § 12132.

**[2] Constitutional Law 92 ⚷243.2**

92 Constitutional Law
    92XI Equal Protection of Laws
        92k243 Creation or Discharge of Liability
            92k243.2 k. Immunity from Liability or
Suit. Most Cited Cases

**Federal Courts 170B ⚷265**

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk264 Suits Against States
                170Bk265 k. Eleventh Amendment in
General; Immunity. Most Cited Cases
Congress, in seeking to abrogate states' Eleventh
Amendment immunity concerning Title II claims
under the ADA through its Fourteenth Amendment
enforcement powers, did not identify a pattern of
discrimination against the disabled by the states and
thus remedy imposed by the ADA was not congruent
and proportional to targeted violation, as required for
Congress' to validly abrogate states' immunity.
U.S.C.A. Const.Amends. 11, 14; Americans with
Disabilities Act of 1990, 42 U.S.C.A. § 12132.

**[3] Federal Courts 170B ⚷266.1**

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk266 Waiver of Immunity
                170Bk266.1 k. In General. Most Cited
Cases
Delaware waived its Eleventh Amendment immunity
from family court mediation and arbitration officer's
suit brought under Rehabilitation Act, which required
that states that accepted federal funds waive their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2
Not Reported in F.Supp.2d, 2001 WL 1000936 (D.Del.), 21 NDLR P 220
**(Cite as: Not Reported in F.Supp.2d)**

Eleventh Amendment immunity; officer worked in program which received federal funds. U.S.C.A. Const.Amend. 11; Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794; 42 U.S.C.A. § 2000d-7.

[4] **Federal Courts 170B** 🖝266.1

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk266 Waiver of Immunity
                170Bk266.1 k. In General. Most Cited Cases
Pursuant to its Spending Clause authority, Congress can legitimately invite states to consent to suit in exchange for federal funds, and thus Congress may require waiver of state sovereign immunity as condition for receiving federal funds, even though Congress could not order the waiver directly. U.S.C.A. Const. Art. 1, § 8, cl. 1; U.S.C.A. Const.Amend. 11.

MEMORANDUM AND ORDER
SLEET, District J.
*1 On May 17, 2001, the plaintiff, Elberta Bernice Lieberman ("Lieberman") filed an amended complaint alleging that the defendants, the Family Court of the State of Delaware and the State of Delaware (collectively, "the defendants," failed to make reasonable accommodations for her disabilities [FN1] in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (1994), and the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994). Lieberman also claims that she has been retaliated against for requesting these reasonable accommodations. Specifically, Lieberman claims that she has been reprimanded on numerous occasions and suspended at least once. For these purported wrongs, Lieberman seeks declaratory and monetary relief.

> FN1. Specifically, Lieberman claims that she suffers from several mental and physical illnesses. These mental illnesses include: attention disorder, dysthymia, and dissasociative identity disorder. D.I. 42, ¶ 17. Lieberman's physical illnesses include: osteoarthritis, chronic venous insufficiency, numerous gastrointestinal disorders and a sleep disorder. *Id.* at ¶ 19-21.

Presently before the court is the defendants' motion to dismiss Lieberman's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Upon consideration of the parties' arguments and the applicable principles of law, the court will grant the defendants' motion as to Lieberman's claims under the ADA, but will deny the defendants' motion as to Lieberman's claims under the Rehabilitation Act. The reasons for the court's decision are set forth in detail below.

*Rule 12(b)(1) Standard*

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint. A motion to dismiss under Rule 12(b)(1) may present either a facial or a factual challenge to subject matter jurisdiction. *Mortensen v. First Federal Savings and Loan,* 549 F.2d 884, 891 (3d Cir.1977). In this case, the defendants are making a facial challenge to the plaintiff's complaint because they do not dispute the existence of any of the jurisdictional facts alleged in the complaint that support the court's subject matter jurisdiction. A motion which makes a facial challenge to a complaint requires that the court consider the allegations of the complaint as true and make all reasonable inferences in plaintiff's favor. *Id.* Moreover, the plaintiff bears the burden of persuading the court that it has jurisdiction. *Id.*

*Discussion*

The defendants assert that because they are immune from suit pursuant to Eleventh Amendment, the court lacks jurisdiction over Lieberman's claims under the ADA and the Rehabilitation Act.[FN2] Generally, pursuant to the Eleventh Amendment, states are immune from suit by private parties in the federal courts. The Eleventh Amendment provides:

> FN2. The defendants also argue that suits against a state must be heard by the United States Supreme Court and therefore, the court lacks jurisdiction to hear this suit. By virtue of 28 U.S.C. § 1331, this court is vested with original jurisdiction over all suits arising under the Constitution, laws or treaties of the United States. See 28 U.S.C. § 1331. Moreover, it has long been established that Congress can give lower federal courts concurrent jurisdiction over matters where the Supreme Court has original jurisdiction.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 1000936 (D.Del.), 21 NDLR P 220
**(Cite as: Not Reported in F.Supp.2d)**

See *Ames v. Kansas,* 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482 (1884). Therefore, under § 1331, the court has jurisdiction over all suits arising under the laws of the United States and presumes that this grant of jurisdiction over all actions includes actions against the States. *See United States v. California,* 328 f.2d 729, 738-39 (9th Cir.1964).

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although this case involves a suit brought by a citizen against her own state, the Eleventh Amendment has long been interpreted to prohibit such suits as well. *See Board of Trustees of University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001).

**\*2** A state will not be entitled to Eleventh Amendment immunity, however, if 1) it has waived its immunity, or 2) Congress has abrogated a state's immunity pursuant to a valid exercise of its power. *See Lavia v. Comm. of Pennsylvania,* 224 F.3d 190, 195 (3d Cir.2000). In this case, Lieberman claims that as to the ADA, Congress has abrogated the state's Eleventh Amendment immunity, and that as to Section 504 of the Rehabilitation Act, the state has waived its immunity. The court will address these issues in turn.

A. Whether Lieberman's ADA claims are barred by the Eleventh Amendment

1. Claims under Title I of the ADA

At the outset, the court notes that it is undisputed that the Supreme Court's recent decision in *Board of Trustees of University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) forecloses any debate as to whether the Eleventh Amendment bars suits for money damages brought by individuals against a state under Title I of the ADA.[FN3] In *Garrett,* the Supreme Court held that suits for damages brought by state employees against the State alleging failure to comply with Title I of the ADA are barred by the Eleventh Amendment. *See id.* at 960. Specifically, the court emphasized that Congress' authority to abrogate Eleventh Amendment immunity under Section 5 of the Fourteenth

Amendment is exercised properly only in response to state transgressions which demonstrate a patten of unconstitutional discrimination by the states. *See id.* at 964. However, the court concluded that "[t]he legislative record of the ADA ... simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled." *Id.* at 965. Because "[s]ection 5 does not so broadly enlarge congressional authority," the Supreme Court concluded that individual lawsuits for money damages against a state for failure to comply with Title I of the ADA are barred by the Eleventh Amendment. *See id.* at 968.

> [FN3]. Title I of the ADA concerns employment discrimination and reads in relevant part:
> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
> *See* 42 U.S.C.A § 12112.

Concerning Title II of the ADA,[FN4] the Supreme Court explicitly declined to decide this issue in *Garrett,* but noted that there are differences between the remedial provisions of Title I and Title II. *See id.* at 960 n. 1 ('We are not disposed to decide the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under [Section 5] of the Fourteenth Amendment when the parties have not favored us with briefing on the statutory question."); *see also Lavia v. Comm. of Pennsylvania,* 224 F.3d 190, 195 n. 2 (3d Cir.2000) (declining to address whether Congress had validly abrogated the immunity of the States with regard to Title II). Thus, the court must determine whether Lieberman's claims for money damages against the state for failure to comply with Title II of the ADA are barred by the Eleventh Amendment.

> [FN4]. Title II reads in relevant part:
> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 1000936 (D.Del.), 21 NDLR P 220
**(Cite as: Not Reported in F.Supp.2d)**

to discrimination by any such entity.
*See* 42 U.S.C.A. § 12132.

2. Claims under Title II of the ADA

Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and "act[s] pursuant to a valid grant of constitutional authority." *Garrett*, 121 S.Ct. at 962. Congress may subject non-consenting States to suit in federal court when it does so pursuant to a valid exercise of its power under Section 5 of the Fourteenth Amendment. *Id.* Section 5 of the Fourteenth amendment grants Congress the power to enforce the substantive guarantees contained in Section 1 of the Fourteenth Amendment [FN5] by enacting appropriate legislation. *See id.* (citing *City of Boerne v. Flores*, 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). Congress' power under Section 5 to enforce the Amendment includes the authority both to remedy and deter violation of rights guaranteed by the Amendment. *See id.*

FN5. Section 1 of the Fourteenth Amendment reads: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. 14 § 1.

**\*3** There is a "simple but stringent test" to determine whether Congress has abrogated state immunity under the Eleventh Amendment. *Lavia v. Comm. of Pennsylvania*, 224 F.3d at 196 (citing *Dellmuth v. Muth*, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)). In this two-part test, a court must first consider "whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity;' and second, whether Congress has acted 'pursuant to a valid exercise of power' " in abrogating state immunity. *Id.*

a. Whether Congress has expressed a clear intent to abrogate?

With regard to the first prong, a legitimate abrogation requires that Congress make "its intention unmistakably clear in the language of the statute." *Id.* (quotations omitted). Section 12202 of the ADA

provides: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202 (1994). The Third Circuit has recognized that Congress has "unequivocally fulfilled the first requirement by expressly stating its intent to abrogate the states' Eleventh Amendment immunity." *Lavia*, 224 F.3d at 196; *see also Doe v. Division of Youth and Family Servs.*, 148 F.Supp.2d 462, 486 (D.N.J.2001) (noting that Congress expressed an intent to abrogate the states' immunity as to Title II of the ADA). The Defendants do not dispute that Congress has clearly expressed its intent to abrogate the States' sovereign immunity, but do contest whether in attempting to abrogate the States' immunity, Congress acted pursuant to a valid exercise of power.

b. Whether Congress acted pursuant to a valid exercise of power?

[1] In this case, the parties dispute whether Congress acted properly under Section 5 of the Fourteenth Amendment.[FN6] In determining whether Congress has validly exercised its power under Section 5 in abrogating state immunity, the court must first, identify the constitutional right at issue, *see Garrett*, 121 S.Ct. at 963. Next, the court must decide whether Congress identified a history and pattern of unconstitutional discrimination against the disabled *by the states* that transgresses the Fourteenth Amendment's substantive provisions, and whether it has proposed a legislative scheme tailored to remedy such conduct. *See id.* at 964 (emphasis added).

FN6. "Although Congress has the authority to enact legislation under its Article I powers, including its power under the Commerce Clause, such authority does not permit Congress to nullify the States' Eleventh Amendment immunity." *Lavia*, 225 F.3d at 196; *see also Garrett*, 121 S.Ct. at 962 (explaining same).

With regard to identifying the relevant constitutional right, the court finds guidance in the Supreme Court's discussion of the issue in *Garrett*. Specifically, the Court looked to its decision in *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), to explain that "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 5
Not Reported in F.Supp.2d, 2001 WL 1000936 (D.Del.), 21 NDLR P 220
(Cite as: Not Reported in F.Supp.2d)

long as their actions towards such individuals are rational.... If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause." *Id.* at 964. In light of the limited protections afforded the disabled under the rational basis standard of the Fourteenth Amendment clause, the court concludes that Congress attempts to impose greater obligations and responsibilities on the States' through Title II of the ADA. *See Lavia,* 224 F.3d at 200 (finding same with regard to Title I of the ADA). Therefore, Title II cannot be seen as enforcing direct violations of the Fourteenth Amendment, but rather, Title II attempts to deter and remedy constitutional violations within the "sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *Id.*

**\*4** [2] "Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text ." *Garrett,* at 963; *see also Lavia,* at 197. Congress can act pursuant to Section 5 to remedy and deter conduct that is not expressly prohibited by Section 1 of the Fourteenth amendment. In doing so, however, Congress must identify a pattern of discrimination against the disabled by the states and adopt a legislative scheme that is tailored to remedy such conduct. *See Garrett,* at 964; *Lavia,* at 201 (explaining that a valid exercise of Section 5 power requires a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end). In deciding, whether there is a pattern of discrimination by the states and if Title II of the ADA is tailored to remedy such conduct, the court finds guidance from three recent district court decisions that extended *Garrett* and *Lavia* to Title II claims of the ADA. These cases include: *Frederick L. v. Department of Public Welfare,* Civ. A. No. 00-4510, 2001 WL 830480 (E.D.Pa. July 23, 2001), *Doe v. Division of Youth and Family Servs.,* 148 F.Supp.2d 462 (D.N.J.2001), and *Moyer v. Conti,* Civ. No. 99-744, 2000 WL 1478791, (E.D.Pa.Oct.5, 2000).

In *Frederick L. v. Department of Public Welfare,* Civ. A. No. 00-4510, 2001 WL 830480 (E.D.Pa. July 23, 2001), the court held that Congress did not validly abrogate the States' sovereign immunity with respect to Title II of the ADA. *See id.* at \*17. Specifically, in addressing the second prong of the "simple but stringent test" for determining if abrogation is valid, the court found that it could not "against the

backdrop of *Kimel* and *Garrett,* find that Congress sufficiently identified a "history and pattern" of unconstitutional discrimination by the States." *Id.* at \*18.

In *Doe v. Division of Youth and Family Servs.,* 148 F.Supp.2d 462 (D.N.J.2001), the court rejected the plaintiffs' argument that their Title II claims under the ADA survive Eleventh Amendment scrutiny in light of *Garrett. See id.* at 484. In finding that Congress did not effectively abrogate the States' sovereign immunity with respect to Title II of the ADA, the court also applied the "simple but stringent test."*See Lavia,* 224 F.3d at 196. The court also applied the reasoning of *Garrett* and found that Congress did not have constitutional authority under Section 5 of the Fourteenth Amendment because Congress had failed to identify a pattern of discrimination against the disabled by the States. The court concluded that the remedy imposed by Congress was not congruent and proportional to the targeted violation. *See Doe,* 148 F.Supp.2d 486.

Finally, in *Moyer v. Conti,* Civ. No. 99-744, 2000 WL 1478791, (E.D.Pa.Oct.5, 2000), the court found that the reasoning of the Third Circuit's *Lavia* decision with respect to Title I applies to Title II as well. Thus, the court held that Congress did not validly abrogate state sovereign immunity under Title II of the ADA. *See id.* at \*6 (also relying on the Supreme Court's decision in *Kimel* ). Specifically, the court stated that, "the state of the legislative record, alone, cannot suffice to bring Title II within the ambit of Congress's Section 5 powers if Title II is not 'adapted to the mischief and wrong which the Fourteenth Amendment was intended to provide against.' ' (agreeing with *Alsobrook v. City of Maumelle,* 184 F.3d 999, 1008. (8th Cir.1999), *cert. granted sub nom., Alsobrook v. Arkansas,* 528 U.S. 1146, 120 S.Ct. 1003, 145 L.Ed.2d 947, *cert. dismissed,* 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000) (holding that claim brought under Title II of the ADA against the State was barred under the Eleventh Amendment)).

**\*5** One recent Eastern District of Pennsylvania district court case, *Jones v. Pennsylvania,* Civ. No. 99-4212, 2000 WL 15073 (E.D.Pa.Jan.5, 2000), denied a state defendants' motion to dismiss the plaintiff's claims under Title II if the ADA on Eleventh Amendment grounds. *Id.* at \*1. However, *Jones* was decided before the Third Circuit's decision in *Lavia* and the Supreme Court's decision in *Garrett.* In allowing the plaintiff's Title II claims to proceed, the court relied upon such cases as: *Muller v.*

Not Reported in F.Supp.2d                                                                          Page 6
Not Reported in F.Supp.2d, 2001 WL 1000936 (D.Del.), 21 NDLR P 220
**(Cite as: Not Reported in F.Supp.2d)**

*Costello,* 187 F.3d 298, 307-10 (2d Cir.1999); *Kimel v. Florida Bd. of Regents,* 139 F.3d 1426, 1433 (11th Cir.1998); *Coolbaugh v.. Louisiana,* 136 F.3d 430, 432-38 (5th Cir.1998); and *Crawford v. Indiana Dep't Corrections,* 115 F.3d 481, 487 (7th Cir.1997). The court notes that in *Lavia,* the Third Circuit questioned the validity of all of these cases, stating that they "have now been called into question by the Supreme Court's decision in *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)." [FN7] *Id.* 224 F.3d at 194 n. 1.

> FN7. In *Kimel* the Supreme Court held that Congress failed to effectively abrogate the States' Eleventh Amendment immunity to suit by private individuals in enacting the ADEA, 29 U.S.C. S 621 et seq. 528 U.S. at 82-83.

In light of the Supreme Court's decision in *Garrett* and the Third Circuit's decision in *Lavia,*[FN8] the court holds that Congress has not validly abrogated the States' Eleventh Amendment immunity concerning Title II claims under the ADA. Thus, the court will grant the defendants' motion as to all of Lieberman's claims under the ADA.

> FN8. Other recent Supreme Court decisions have held that Congress has exceeded its authority under Section 5. *See e.g., Kimel v. Bd. Of Regents of Florida,* 526 U.S. 62 (holding that Congress acted beyond the scope of its Section 5 powers in enacting the ADEA, and thus did not abrogate the States' Eleventh Amendment Immunity); *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (holding the same with regard to the civil remedy provision of the Violence Against Women Act); *Florida Prepaid Postsecondary Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (holding the same with regard to the Patent Remedy Act); *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)(holding the same with regard to the Religious Freedom Restoration Act).

B. Whether Lieberman's Rehabilitation Act claims are barred by the Eleventh Amendment?

[3] Next, the court turns to the defendants' contention that the they are entitled to Eleventh Amendment immunity from suits by private individuals in federal courts for claims arising under § 504 of the Rehabilitation Act. Section 504 states in part:
No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a) (1994). In this case, Lieberman argues that the State has waived its sovereign immunity. The Court agrees.[FN9]

> FN9. The parties also dispute whether Section 504 was enacted pursuant to Congress' authority under Section 5 of the Fourteenth Amendment. The court need not address this argument, however, because it finds that the State has waived its sovereign immunity. The court does note that there is "some ambiguity regarding the authority pursuant to which Congress enacted section 504." *Frederick L.,* 2001 WL 830480, at *7 (citing *Armstrong v. Wilson,* 942 F.Supp. 1252, 1262 (N.D.Cal.1996) ("the Rehabilitation Act is silent as to the constitutional authority under which it was enacted").

[4] The Rehabilitation Act requires that States that accept federal funds waive their Eleventh Amendment Immunity to suits brought in federal court for violations of Section 504. 42 U.S.C. § 2000d-7. Pursuant to its Spending Clause authority, Congress can legitimately invite the States to consent to suit in exchange for federal funds. *See Frederick L.,* 2001 WL 830480, at *6. Specifically, Congress may require a waiver of state sovereign immunity as a condition for receiving federal funds, even though Congress could not order the waiver directly. *See Jim C. v. United States,* 235 F.3d 1079, 1081 (8th Cir.2000) (citing *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 686, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999)).

*6 In this case, Lieberman has established that as a Family Court mediator and arbitration officer, she worked in an activity or program which received and benefitted from federal financial assistance. D.I. 42,

at ¶ 8. Thus, the court concludes that the defendants have waived their Eleventh Amendment immunity, and thus, will deny the defendants motion to dismiss Lieberman's claims under Section 504 of the Rehabilitation Act, 29 U.S.C. S 794. *See Frederick L, 2001 WL 830480, at *12* (denying defendants' motion to dismiss plaintiff's Rehabilitation Act claims because Pennsylvania had waived it sovereign immunity); *Maull v. Division of State Police,* 141 F.Supp.2d, 472 (D.Del.2001). *See also Jim C. v. United States,* 235 U.S. F.3d at 1082 (holding that Arkansas waived its sovereign immunity with respect to Section 504 when it chose to participate in the federal spending program created by the section).

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Dismiss for Lack of Jurisdiction is GRANTED as to Lieberman's claims under both Title I and Title II of the ADA;
2. The defendants' Motion to Dismiss for Lack of Jurisdiction is DENIED as to Lieberman's claims under Section 504 of the Rehabilitation Act.


D.Del.,2001.
Lieberman v. Delaware
Not Reported in F.Supp.2d, 2001 WL 1000936 (D.Del.), 21 NDLR P 220

Briefs and Other Related Documents (Back to top)

• 2005 WL 2385614 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Brief for Summary Judgment on the Substantive Issues (Jul. 29, 2005)
• 2005 WL 2385719 (Trial Motion, Memorandum and Affidavit) Plaintiff Elberta Bernice Lieberman'S Answering Brief in Opposition to the Defendants' Motion for Summary Judgment on the Substantive Issues (Jul. 15, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for GERARD,LAURA L 2234859**

| | |
|---|---|
| Date/Time of Request: | Monday, May 15, 2006 16:04:00 Central |
| Client Identifier: | LLG |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 703 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39
(Cite as: Not Reported in F.Supp.2d)

C
Briefs and Other Related Documents

United States District Court,W.D. Wisconsin.
Joe THOMPSON, Plaintiff,
v.
EATON CORPORATION, Cutler-Hammer Division,
Defendant.
**No. 02-C-051-C.**

Filed On Jan. 25, 2002.
Dec. 11, 2002.
Closed On Dec. 24, 2002.
Last Updated On Dec. 24, 2002.


Mary E. Kennelly, for Plaintiffs.
F. Daniel Balmert, Vorys, Sater, Seymour & Pease, Cleveland, OH, For: Eaton Corporation, for Defendants.

OPINION AND ORDER

CRABB, J.

**\*1** In this civil action for monetary and injunctive relief, plaintiff Joe Thompson contends that his employer, defendant Eaton Corporation, refused to reasonably accommodate his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § § 12101-12213. In addition, plaintiff contends that defendant discriminated against him because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623-634. Subject matter jurisdiction is present under 28 U.S.C. § 1331. The case is before the court on defendant's motion for summary judgment.

Defendant's motion will be granted in part and denied in part. I conclude that plaintiff is not an "individual with a disability" within the meaning of the ADA. Accordingly, plaintiff's claim under the ADA will be dismissed. However, I conclude that plaintiff has adduced sufficient evidence to permit a reasonable jury to find that defendant discriminated against plaintiff on the basis of age. Therefore, I will deny defendant's motion with respect to plaintiff's claim under ADEA.

From the proposed findings of fact and the record, I find the following material facts to be undisputed.

UNDISPUTED FACTS

A. *Plaintiff's Record of Employment*

Plaintiff Joe Thompson worked in the electronics repair and testing field from 1941 until June 9, 2000. In 1977, plaintiff was hired as a tester by Cutler-Hammer, which was later acquired by defendant Eaton Corporation.

Plaintiff was promoted in 1998 to Competency Level 5 and was responsible for the testing on the SVFC-4 product line from 1998 to 2000 in Department 602. Competency Level 5 was the highest competency level. Plaintiff performed his job competently. All of plaintiff's performance reviews conducted during his employment with defendant were satisfactory and he received periodic merit increases. At no time before June 9, 2000, was plaintiff informed that there was any problem with his job performance. Plaintiff was 77 years old on June 9, 2000.

B. *Module Testing*

1. *Decision to conduct module testing*

In April 2000, two departments at Eaton, including Department 602, were involved in the Automated Modular Program project. The project concerned the production and testing of a series of electronic controls for use by the United States Navy in its nuclear attack submarines. Defendant's customer on the project, BPMI, was the distributor of the project components to the Navy. BPMI sent several letters to defendant expressing concern over defendant's quality control. BPMI scheduled a site visit to Eaton in late April 2000 to examine quality assurance. Just before BPMI's visit, defendant decided to impose its own quality assurance and to initiate a corrective action plan involving training and testing.

Defendant contracted with Jim Cotey to create a module training program to retrain employees in the knowledge and skills that were essential to the effective performance of the project. In addition, Cotey was to develop a task-based testing program to confirm that the employees trained had learned the material in the module training program and could

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 2
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39
**(Cite as: Not Reported in F.Supp.2d)**

perform tasks required by the contract. Gregory Stasinopoulos, defendant's manufacturing manager for Navy Nuclear, was in charge of module testing.

### 2. *Preparation for module testing*

**\*2** Although plaintiff's responsibilities had little to do with the Automated Modular Program, he was required to participate in the training and testing. All of the other employees affected by the plan were at least 20 years younger than plaintiff except Dorothy Luciani, who was 11 years younger.

Starting in late April 2000, defendant provided classroom training on each module to every associate for approximately four hours a week. The classroom training lasted from 45 minutes to 90 minutes for each module depending upon its size and complexity. During classroom training, plaintiff participated in practice tests that were graded. Plaintiff missed some of the classroom training because of funeral leave from May 26 to June 6, 2000, and because of a medical appointment the morning of June 9, 2000. Plaintiff never indicated to anyone that he wanted to make up the classes he missed while on funeral leave.

At his first module training class, and prior to taking any module test, plaintiff was informed of the following: (1) like everyone else in Departments 602 and 804, he was required to take module training and pass all seven module tests with a grade of 100 percent; (2) he would have three opportunities to pass all seven module tests; and (3) if he failed to pass all seven modules, he would be demoted from his position at Competency Level 5 and transferred out of Department 602. Plaintiff was not told in advance when the module testing was to occur.

### 3. *Implementation and consequences of module testing*

In May 2000, defendant began module testing of employees in plaintiff's department. According to defendant's procedures, any associate that failed any module three times would be disqualified from his or her current classification and would not be allowed to hold any of the assembly positions within Department 804 or any of the tester positions within Department 602. Instead, the person would be reassigned to a Competency Level 2 position outside Departments 804 and 602, or to a Competency Level 1 position based on seniority. Alternatively, employees could elect layoff or severance. Each

module test was graded immediately upon completion. Each employee received feedback on any mistake and was briefed on the correct response.

There was no deadline for the completion of module testing. Stasinopoulos told supervisors that if an employee was not ready to take a module test, the employee should not be forced to take it. It was Stasinopoulos's intent that employees should feel as prepared as possible before taking the test. It was Cotey's practice to excuse employees who felt they were not ready to take the module test and he did excuse employees who indicated they were not ready to take the test.

### 4. *Tutoring begins*

On May 15, 2000, the union began tutoring on the modules. Greg Burzynski, shop steward for plaintiff's department, was appointed as union tutor for employees that needed assistance. Defendant decided that any employee failing a module test before tutoring began should be given the option of receiving personal tutoring from the union. Plaintiff had access to personal tutoring with Burzynski before he took the module tests three times. However, plaintiff was displeased with his training and tutoring by Burzynski.

### 5. *Plaintiff's first and second module tests*

**\*3** Plaintiff took his first round of testing on May 15-17, 2000. Plaintiff failed six of the seven test modules. Any associate failing three or more modules during the first round of testing was required to be re-tested on all seven modules. Burzynski reviewed the test results with plaintiff.

The day plaintiff returned from funeral leave, plaintiff began his second round of testing. This time, plaintiff failed five of the seven test modules. After plaintiff and others failed the module tests in the second round, Stasinopoulos went over the test results on each test with everyone in the room and pointed out what mistakes had been made.

### 6. *Treatment of other employees failing the module testing three times*

Four employees failed the module testing three times before May 15, 2000, when the union began its tutoring program. Defendant allowed these

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39
**(Cite as: Not Reported in F.Supp.2d)**

employees to take the test a fourth time to allow them the benefit of the tutoring.

C. *Plaintiff's Diabetes*

1. *Plaintiff's Diabetes*

Plaintiff was first diagnosed with adult-onset Type 2 (non-insulin dependent) diabetes on February 9, 1999. On that date, plaintiff was hospitalized with a blood sugar level of 534, which put him at risk of a diabetic coma. Plaintiff's physician, Dr. Anselm Lam, instructed plaintiff to regulate his blood sugars using oral medications and diet. While hospitalized, plaintiff received training on how to regulate his blood sugars including but not limited to: diet, exercise, the use of a glucometer to test and monitor his blood sugars and the use of the prescribed oral medication Glucophage. On February 10, 1999, plaintiff was discharged from the hospital.

Plaintiff was off work and unable to perform any type of job until March 14, 1999. Defendant knew plaintiff had diabetes and that it was the reason for his absence from work. During the period from February 9, 1999, to March 13, 1999, plaintiff had trouble adjusting to the medication prescribed by Dr. Lam. He was very weak and experienced periods of nausea, loss of balance, dizziness, blurred vision and muscle cramping.

Plaintiff began monitoring his blood sugar three times every day: once in the morning before breakfast, once at noon before lunch and then once in the evening. Plaintiff has also taken two oral tablets of Glucophage every day since February 1999.

Despite plaintiff's efforts to monitor his blood sugar, he experienced at least four hypoglycemic reactions between February 9, 1999, and June 9, 2000. Three of the reactions occurred while plaintiff was at work and one occurred while he was at home. The hypoglycemia caused him to experience dizziness, weakness, nausea, shaking and blurred vision. As a general rule, after plaintiff ate in response to his hypoglycemia, it took one hour for his blood sugar to come back to normal and for the symptoms to dissipate. If plaintiff had a low blood sugar reaction, he would eat something sweet such as a glucose tablet.

**\*4** Between February 9, 1999, and June 9, 2000, plaintiff experienced symptoms of diabetic

neuropathy, including pain, numbness and burning in his feet. Any symptoms of peripheral neuropathy that plaintiff experienced were intermittent and were adequately addressed by medication.

Upon plaintiff's return to work on March 14, 1999, Dr. Lam placed no written work restrictions on plaintiff because of his diabetes. Before June 9, 2000, plaintiff never approached defendant with any complaint of physical pain in performing his work or expressed any concerns about his ability to perform his job. Before June 9, 2000, there was no part of plaintiff's job that he could not do because of his diabetes.

D. *Events of June 9, 2000*

1. *Plaintiff's medical appointment*

On the morning of June 9, 2000, plaintiff went to the doctor for his regular diabetes checkup and blood test. Believing that his doctor had instructed him not to eat the morning of his appointment, plaintiff did not eat anything before the blood tests were taken. The results of plaintiff's blood test at 9:30 am indicated a glucose level of 131, which is slightly elevated. Plaintiff reported to Dr. Goetz, a colleague of Dr. Lam, that he had no physical complaints. Plaintiff also reported that he could spend over an hour cutting grass uphill with a walk-behind mower. Dr. Goetz granted plaintiff's request to resume playing tennis. When plaintiff left Dr. Lam's office, the personnel at Dr. Lam's office instructed him to eat his breakfast and take his Glucophage medication. Taking Glucophage medication without food can cause a drop in blood sugar.

2. *Plaintiff's return to work*

When plaintiff returned to work, he checked his blood sugar level, which was 60. A blood sugar level of 60 is borderline hypoglycemic. After performing the blood test, plaintiff took his Glucophage and knew that he needed to eat. Plaintiff's lunch consisted of a baloney sandwich, an apple, a banana and orange juice. The lunch could have helped him bring up his glucose level in a couple of minutes. Glucose tablets also could have brought up his glucose level. Plaintiff did not take any glucose tablets that morning and he had only two bites of his baloney sandwich before he took his module tests before his supervisor, Merrill Robinson, told him it was time for module training

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 4
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39
**(Cite as: Not Reported in F.Supp.2d)**

and testing.

### 3. *Module testing of plaintiff*

Immediately after Robinson's instruction, plaintiff went to the module testing area. Even though other training was over before plaintiff arrived, plaintiff met Burzynski for 15 minutes of tutoring on the DMli module and Burzynski told him that he would have to take the module test that day. Plaintiff then began the third round of module testing, which was proctored by Cotey. Plaintiff was dizzy, shaking, could not concentrate, had blurred vision and was unable to see the computer screen during the testing.

Plaintiff failed the DMli Drawing Inquiry Quiz module, a module that he had failed before, on May 15 and June 6. Cotey told Stasinopoulos that plaintiff had failed and Stasinopoulos then told Cotey to inform Human Resources. Stasinopoulos knew plaintiff was a diabetic. Shortly after he completed the test, plaintiff was called to the Human Resources office to meet with Eric Duerksen.

### 4. *Termination of plaintiff*

**\*5** Duerksen told plaintiff that he had failed the test and that he had a choice of accepting one of four options (1) a position as either a navy cell operator or an employee in the glass operating department at a Competency Level 2 salary range of $13.80 per hour; (2) a position as a custodian at Competency Level 1 salary range $12 .33 per hour; (3) a layoff; or (4) a severance package. The custodial position was a night shift position and the description provides that the job requires "sustained physical effort manually brushing floors or operating machines" and that working conditions are "somewhat disagreeable" because of "noise, dirt, etc." Burzynski asked the Human Resource Manager, Reb Kavalec, whether plaintiff could continue working in Department 602 testing circuit boards in the lab, but she said he could not. Plaintiff chose the severance package. At the end of the meeting, Stasinopoulos told plaintiff "Life is too short. We are not getting any younger. Go and enjoy your life."

### OPINION

### A. *Summary Judgment Standard*

The standards for summary judgment are well known. Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Weichering v. Riegel,* 160 F.3d 1139, 1142 (7th Cir.1998). If the non-movant fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When considering a motion for summary judgment, the court must examine the facts in the light most favorable to the non-moving party. *Sample v. Aldi, Inc.,* 61 F.3d 544, 546 (7th Cir.1995).

### B. *Americans with Disabilities Act*

Although in his amended complaint, plaintiff alleges that defendant violated both the Americans with Disabilities Act and the Rehabilitation Act, he makes no argument in his brief regarding the Rehabilitation Act in response to defendant's argument that it is entitled to summary judgment on plaintiff's claim under that act. "Arguments not developed in any meaningful way are waived." *Central. States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir.1999). Accordingly, I will consider only the Americans with Disabilities Act in this opinion.

The ADA prohibits employers from discriminating against disabled employees who are otherwise qualified. 42 U.S.C. § 12112(a). The definition of "discriminate" in the act is broad. Among other things, it includes disparate treatment, disparate impact, failing to make a reasonable accommodation and requiring certain medical examinations or inquiries. 42 U.S.C. § 12112(b); *see also Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1032 (7th Cir.1999). Plaintiff contends that defendant discriminated against him both by failing to accommodate him under § 12112(b)(5)(A) and by failing to select and administer a test in a way that accurately represents his skills under § 12112(b)(7) when defendant refused plaintiff's request to postpone the test until plaintiff had eaten. (Defendant disputes that plaintiff made such a request.) The parties agree that to prevail on this claim, plaintiff must demonstrate first that 1) he is an "individual with a disability" 2) defendant was aware of his disability; 3) he was a qualified individual who could perform the essential functions of the employment position with or without reasonable accommodation.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39
**(Cite as: Not Reported in F.Supp.2d)**

*Basith v. Cook County,* 241 F.3d 919, 927 (7th Cir.2001).

1. *Individual with a disability: record of impairment*

**\*6** _____ In their briefs, the parties focus on whether plaintiff is an "individual with a disability" within the meaning of the ADA. A person meets this definition if he or she (a) has a physical or mental impairment that substantially limits one or more major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment. 42 U.S.C. § 12102(2)(A)-(C). Plaintiff contends that he satisfies the second definition, that is, he has a *record* of an impairment that substantially limited at least one major life activity.

The ADA does not define what it means to have a "record" of an impairment, leaving courts to struggle on their own to flesh out the term. For instance, the Court of Appeals for the Eighth Circuit has interpreted "record" literally to mean "documentation." *Webber v. Strippit, Inc.,* 186 F.3d 907, 915 (8th Cir.1999); *see also Taylor v. Nimock's Oil Co.,* 214 F.3d 957 (8th Cir.2000) (following *Webber* ). In contrast, the Court of Appeals for the Seventh Circuit relied on the EEOC's interpretive regulations in holding that § 12102(2)(B) "extends the coverage of the ADA to persons who 'have a history of, or have been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 509 (7th Cir.1998) (quoting 29 C.F.R. § 1630.2(k)). The court included in this definition "people who have recovered from previously disabling conditions" such as "cancer or coronary disease." *Id.; see also Bailey v. Georgia-Pacific Corp.,* 306 F.3d 1162, 1169 (1st Cir.2002) ("The purpose of this provision is largely to protect those who have recovered or are recovering from substantially limiting impairments from discrimination based on their medical history.") (citing H.R.Rep. No. 101-485(II), at 52 (1990)). Thus, the analysis under § 12102(2)(B) is similar to § 12102(2)(A). Specifically, § 12102(2)(B) protects those who would have at one time satisfied the first definition of disabled under § 121012(2)(A) but no longer do so because their impairment has become less severe or no longer exists. (The definition in *Midelfort* appears to apply to those who have never been substantially impaired but have been "misclassified" as such. If so, however, it is not clear what the difference is between being "misclassified" as disabled and being "regarded" as disabled under §

12102(2)(C). Limiting the definition to those who were formerly misclassified but who are no longer considered disabled is problematic because it is difficult to imagine circumstances under which an individual would be discriminated against because of a *past* belief the employer held but has now abandoned. In any event, plaintiff does not argue that he was either misclassified or regarded as disabled so it is unnecessary to determine the proper application of those terms.)

The Supreme Court has set forth a three-step inquiry to determine whether a plaintiff is disabled under § 12102(2)(A): (1) whether plaintiff's condition is a physical or mental impairment; (2) whether the impairment affects a major life activity; and (3) whether plaintiff's impairment is a substantial limitation on the identified major life activity. *Bragdon v. Abbott,* 524 U.S. 624, 632, 637, 639 (1998). Defendant concedes that plaintiff's diabetes was and still is a physical impairment. *See Lawson v. CSX Transportation, Inc.,* 245 F.3d 916, 923 (7th Cir.2001). Plaintiff identifies seeing, eating, thinking and working as activities that have been affected by his diabetes. Defendant does not dispute that these are major life activities. *See* 29 C.F.R. § 1630.2(i) (defining major life activity to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."); *see also Nawrot v. CPC International,* 277 F.3d 896, 903 (7th Cir.2002) (thinking is a major life activity); *Lawson,* 245 F.3d at 923 (eating is a major life activity). The question is whether any of those activities has been substantially limited in the past.

**\*7** A major life activity is "substantially limited" when the impairment "prevents or severely restricts" an individual's ability to perform the activity. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 198 (2002); *see also Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491 (1999) (using dictionary to define substantial as meaning "considerable" or "specified to a large degree."); 29 C.F.R. § 1630.2(j)(1) ("substantially limits" means "unable to perform" or "significantly restricted" in performing a major life activity compared to the "average person in the general population"). "The impairment's impact must also be permanent or long term." *Williams,* 534 U.S. at 198.

Although there is no question that diabetes is an impairment, the court of appeals has held that in and of itself diabetes is not a disability. *Nawrot,* 277 F.3d at 904. Rather, a court must make an "individualized

Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39
**(Cite as: Not Reported in F.Supp.2d)**

inquiry" of the impairment's effect on each person seeking ADA protection. *See Sutton,* 527 U.S. at 483; *Bragdon,* 524 U.S. at 641-42. In addition, the determination whether an individual is disabled "depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting." *Sutton,* 527 U.S. at 488. Therefore, even if an impairment, " 'might,' 'could,' or 'would' " be substantially limiting if left untreated, an individual is not disabled if he or she is not substantially limited when mitigating or corrective measures are taken into account. *Id.* at 482. However, both the positive *and* negative side effects of mitigating measures should be considered. *Id.* at 484.

It is undisputed that, for the most part, plaintiff is able to keep his diabetes under control with medication. Although even with his medication, plaintiff must adhere to a number of dietary restrictions, the court of appeals has held that this does not constitute a substantial limitation of the major life activity of eating. *Lawson,* 245 F.3d at 924-25. (Plaintiff has also proposed facts regarding pain, numbness and burning in his feet as a result of diabetic neuropathy. However, he does not argue in his brief that he was substantially limited in the major life activity of walking or standing. Therefore, plaintiff has waived this argument. *Central States,* 181 F.3d at 808. Furthermore, it is undisputed that plaintiff could control the symptoms regarding his feet with medication.)

What remains, then, is plaintiff's hospital stay on February 9 and 10, the following five-week period of recovery before plaintiff returned to work and the four hypoglycemic reactions he experienced despite his efforts to monitor his blood sugar. It is undisputed that during plaintiff's five-week recovery period from February 10, 1999, to March 13, 1999, he was unable to perform any type of job. However, plaintiff has proposed no facts regarding other limitations that he experienced during this time. It is also undisputed that when he has a hypoglycemic reaction, which may last an hour, plaintiff experiences dizziness, weakness, nausea, shaking, difficulty concentrating and blurred vision. Again, however, plaintiff has proposed no facts regarding the severity of these symptoms, with the exception that he was unable to see the computer screen on June 9, 2000. The question is whether these facts are sufficient to permit a reasonable jury to find that plaintiff has a record of being substantially limited with respect to at least one major life activity.

**\*8** On its face, one Supreme Court case suggests that

they are sufficient. In *School Board of Nassau County v. Arline,* 480 U.S. 273 (1987), the plaintiff was hospitalized for tuberculosis in 1957, her tuberculosis was in remission for 20 years and she tested positive for active tuberculosis in 1977 and 1978. *Id.* at 276. In 1978, she was terminated from her position as an elementary school teacher because of the recurrence of her tuberculosis. *Id.* at 276-77. The court held that the plaintiff's tuberculosis was a disability because "[t]his impairment was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment. Thus, Arline's hospitalization for tuberculosis in 1957 suffices to establish that she has a 'record of ... impairment' ... and is therefore a handicapped individual." *Id.* at 281.

Stripped of its facts, *Arline* seems to suggest that any impairment "serious enough to require hospitalization" is substantially limiting. In context, however, *Arline* is not so broad. The plaintiff had been hospitalized from May 1957 until August 1958. *Arline v. School Board of Nassau County,* 692 F.Supp. 1286, 1289 (M.D.Fla.1988). *See also Byrne v. Board of Education,* 979 F.2d 560, 566 (7th Cir.1992) (declining to interpret *Arline* "as establishing the nonsensical proposition that any hospital stay is sufficient to evidence a 'record of impairment' "). This suggests that a hospital stay must be lengthy for it to establish disability on its own. That interpretation would be consistent with later Supreme Court cases, such as *Williams,* 534 U.S. at 198, which have held that an impairment's impact must be permanent or long term to qualify as substantially limiting.

Plaintiff's hospital stay was only one or two days, but it was followed by five weeks during which he was unable to work. The Supreme Court has not yet decided whether "working" is a major life activity. *See Toyota,* 534 U.S. at 200 ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today.") The Court of Appeals for the Seventh Circuit, however, has held repeatedly that it is. *See, e.g., Stein v. Ashcroft,* 284 F.3d 721, 724 (7th Cir.2002); *Amadio v. Ford Motor Co.,* 238 F.3d 919, 925 (7th Cir.2001). To establish a substantial limitation on the major life activity of working, a plaintiff must show an inability to perform either a class of jobs or a broad range of jobs in various classes, as compared to the average person of comparable training, skills and abilities. *Sutton,* 527

Not Reported in F.Supp.2d                                                                                          Page 7
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39
**(Cite as: Not Reported in F.Supp.2d)**

U.S. at 492; *EEOC v. Rockwell International Corp.,* 243 F.3d 1012, 1017 (7th Cir.2001); 29 C.F.R. § 1630.2(j)(3)(i). Generally, this requires evidence of the demographics of the relevant labor market. *Rockwell,* 243 F.3d at 1017-18. However, because defendant does not dispute that plaintiff was unable to work at *any* job from February 9 until March 14, such evidence is unnecessary for the purpose of defeating defendant's motion for summary judgment.

**\*9** The problem is that even three weeks is an insufficient period of time to establish a substantial limitation, at least in this circuit. *See, e.g., Ogborn v. United Food and Commerical Workers Union,* 305 F.3d 763, 767 (7th Cir.2002) (plaintiff was not impaired in major life activity of working when his depression caused him to miss work for eight weeks). *See also Hilburn v. Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1229 (11th Cir.1999) (since plaintiff did not demonstrate any substantially limiting residual effects from her heart problems, 38-day absence from work following her heart attack did not constitute a record of impairment) *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 645-46 (2d Cir.1998) (finding that jury could reasonably believe that plaintiff was unable to work for seven months, but that seven-month impairment with unparticularized residual limitations too brief and too vague to constitute substantially limiting record of impairment); *Heintzelman v. Runyon,* 120 F.3d 143 (8th Cir.1997) (inability to work while recovering from surgery not substantial impairment); *McDonald v. Pennsylvania,* 62 F.3d 92 (3d Cir.1995) (inability to work for two months following surgery not substantial limitation). Thus far, the Court of Appeals for the Seventh Circuit has found a record of impairment in cases in which the plaintiff was substantially impaired for a number of years. *See, e.g., Lawson,* 245 F.3d at 926-27 (finding that jury could conclude that plaintiff's inability to maintain any significant employment for number of years constituted record of diabetes that substantially limited his ability to work); *Davidson,* 133 F.3d at 510 (finding that plaintiff presented enough evidence to raise question of fact whether she had record of impairment because she confronted impediments to her ability to learn throughout high school, college and graduate school). *But see McKenzie v. Dovala,* 242 F.3d 967, 968, 972-73 (10th Cir.2001) (finding that reasonable jury could conclude that plaintiff had record of disability when her disorder caused her to miss work for approximately two months); *Wheaton v. Ogden Newspapers, Inc.,* 66 F.Supp.2d 1053, 1064 (N.D.Iowa 1999)(plaintiff's two hospitalizations for back pain and record of employer's accommodations for plaintiff's severe back pain enough to create genuine issue of material fact whether plaintiff had record of impairment).

This is a closer case because plaintiff continued to experience recurrent limitations in the form of hypoglycemic reactions even after he was able to work again. Some courts have held that intermittent symptoms of a chronic impairment are sufficient to show that a plaintiff is an individual with a disability. *See, e.g., Otting v. I.C. Penney Co.,* 223 F.3d 704 (8th Cir.2000) (holding that plaintiff with epilepsy was disabled when, even with medication, she continued to suffer 2-3 seizures each month, during which she could not see, hear, speak, walk or work); *Criado v. IBM Corp.,* 145 F.3d 437 (1st Cir.1998) (holding that reasonable jury could conclude that plaintiff who had recurring, short-term bouts of depression over period of seven years was disabled under ADA).

**\*10** However, the Court of Appeals for the Seventh Circuit has not embraced this view. In *Moore v. J.B. Hunt Transport, Inc.,* 221 F .3d 944 (7th Cir.2000), the plaintiff was a man with arthritis. Although he was usually able to control his condition with medication, he experienced "flare ups" once or twice a year during which he could not move for at least a day. The court held that his "infrequent flare-ups" did not "render the condition a disability ." *Id.* at 952. Even assuming that *Moore* is distinguishable from this case because plaintiff's hypoglycemic reactions were more frequent, plaintiff has proposed no facts suggesting that his reactions substantially limited a major life activity. *See Nawrot,* 277 F.3d at 905 (concluding that plaintiff with diabetes was disabled in part because he suffered from hypoglycemic reactions in which he lost consciousness and fell and reactions were "of such extreme consequence that death is a very real and significant risk"). It is undisputed that plaintiff became weak, dizzy and had difficulty concentrating during his reactions, but there is no evidence that these symptoms were severe. Furthermore, it is undisputed that plaintiff's symptoms usually subsided within an hour after eating and as quickly as a few minutes after taking a glucose tablet. Therefore, whether plaintiff's claim is analyzed under § 12102(2)(A) or § 12102(2)(B), I conclude that plaintiff has failed to raise a genuine issue of material fact on his claim that he is disabled under the ADA.

C. *Age Discrimination in Employment Act*

Not Reported in F.Supp.2d                                                                                Page 8
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39
**(Cite as: Not Reported in F.Supp.2d)**

The ADEA makes it unlawful for an employer "to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may prove a violation of the ADEA in two ways: She may try to meet her burden head on by presenting direct or circumstantial evidence that age was the determining factor in her discharge. Or, as is more common, she may utilize the indirect, burden-shifting method of proof for Title VII cases originally set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 ... and later adapted to age discrimination claims under the ADEA.

*Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 396 (7th Cir.1997); *see also Swierkiewicz v. Sorema N. A.,* 534 U .S. 506, 511-12 (2002).

Immediately after plaintiff's termination, Stasinopoulos said, "Life is too short. We are not getting any younger. Go and enjoy your life." Plaintiff has conceded that this statement does not constitute direct evidence of discrimination. *See Lim v. Trustees of Indiana University,* 297 F.3d 575, 580 (7th Cir.2002) ("[D]irect evidence should 'prove the particular fact in question without reliance upon inference of presumption." ') (quoting *Markel v. Board of Regents of the University of Wisconsin,* 276 F.3d 906, 910 (7th Cir.2002)). As defendant has pointed out, this statement "could have been made in an attempt by Stasinopoulos to console him and to make him feel better." Dft's Br., dkt. # 23, at 27. However, "it is not true that to get over the hurdle of summary judgment a plaintiff must produce the equivalent of an admission of guilt by the defendant. All that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class." *Troupe v. May Department Stores Co.,* 20 F.3d 734, 737 (7th Cir.1994). "Ambiguous statements" and "suspicious timing" can be enough to support an inference of discrimination without going through the *McDonnell Douglas* burden shifting framework, particularly if the remark (1) is made by the decisionmaker and at the time of the adverse employment action and (2) expresses discriminatory feelings. *Gorence v. Eagle Food Centers, Inc.,* 242 F.3d 759, 762 (7th Cir.2001).

**\*11** The comment made by Stasinopoulos could be interpreted reasonably to mean that he believed plaintiff was too old to work. *See Sheehan v. Donlen,* 173 F.3d 1039, 1045 (7th Cir.1999) (statement of

"Hopefully this will give you some time to spend at home with your children" made by plaintiff's boss before firing her supported jury's finding of intentional discrimination). Furthermore, it is undisputed that Stasinopoulos was a decisionmaker and that the statement was made at the time that plaintiff was given the option of demotion or termination. Combined with plaintiff's allegation that Stasinopoulos refused without explanation to allow plaintiff to retake the test even after plaintiff told him he had failed the test because he had been ill, I conclude that Stasinopoulos's statement would permit a jury to find that plaintiff's age was a motivating factor in defendant's decision to terminate or demote plaintiff.

Even assuming that Stasinopoulos's statement is insufficient on its own, I conclude nevertheless that plaintiff would survive summary judgment under the *McDonnell Douglas* method of proof. The parties agree that to make out a prima facie case under *McDonnell Douglas,* plaintiff must show the following four elements: (1) he was in the protected age class (over 40); (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated and substantially younger employees were treated more favorably. *See Fisher v. Wayne Dalton Corp.,* 139 F.3d 1137, 1141 (7th Cir.1998). (Generally, in a discharge or demotion case, the plaintiff can satisfy the fourth part of the test with evidence that defendant replaced him or her with a substantially younger employee. *See Ritter v. Hill 'N Dale Farm, Inc.,* 231 F.3d 1039, 1043 (7th Cir.2000); *Hoffmann v. PRIMEDIA Special Interest Publications,* 217 F.3d 522, 524 (7th Cir.2000); *Bellaver v. Quanex Corp.,* 200 F.3d 485, 494-95 (7th Cir.2000). Although it is likely that plaintiff's position was either acquired or absorbed by a substantially younger employee or employees, the parties have proposed no facts regarding plaintiff's replacement). Nevertheless, the *McDonnell Douglas* inquiry was not intended to be "rigid, mechanized or ritualistic." *Furnco Construction Corp. v. Waters,* 438 U.S. 567,577 (1978). Furthermore, the court of appeals has stated that in a discharge case, a plaintiff may establish a prima facie case under *McDonnell Douglas* "by presenting evidence that he was qualified for the job in question and that he lost it to, *or* was otherwise treated less favorably than ... a substantially younger worker." *See Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1397 (7th Cir.1997) (emphasis added). Therefore, I will analyze plaintiff's claim under the framework suggested by the parties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant does not seriously deny that plaintiff satisfies the first three parts of the test. Plaintiff was 77 years old on June 9, 2000, and was performing his job competently. In addition, after taking the tests, plaintiff was given the option of a demotion, layoff or severance, all of which constitute adverse employment action. *See Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1111 n. 7 (7th Cir.1996)* ("[A] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wages or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices that might be unique to a particular situation.") The dispute is whether defendant treated younger similarly situated employees more favorably.

**\*12** Plaintiff alleges that he was treated differently in two ways: (1) other employees who failed the tests three time were given another chance "because they had not been adequately trained" but plaintiff was not given this chance; and (2) plaintiff was required to take the test when he was not ready to do so. With respect to plaintiff's first allegation of differential treatment, I agree with defendant that plaintiff was not similarly situated to the employees who were given a fourth opportunity to take the test. It is undisputed that some employees were given another chance not simply because "they had not been adequately trained," but because they had failed the tests before defendant began tutoring. Plaintiff failed each of his tests *after* he began to receive tutoring. Although the facts show that plaintiff missed some of his training sessions and was not satisfied with the training he received, there is no evidence that defendant refused to allow plaintiff to make up his missed sessions or that the training plaintiff did receive was somehow inferior to the training that the younger employees received.

However, I conclude that there is a material dispute whether defendant allowed substantially younger employees to postpone their test when they were not ready but refused to do the same for plaintiff. It is undisputed that defendant allowed other employees to postpone their tests and that all of these employees were substantially younger than plaintiff. Plaintiff alleges that Robinson, his supervisor, interrupted him during lunch and told plaintiff he had to prepare for testing and that when plaintiff asked Robinson whether he could postpone the test because he was diabetic, had been unable to eat and was feeling ill, Robinson told him he could not. In addition, plaintiff alleges that during the test, he told Cotey, who was

administering the test, that he did not feel well, his vision was blurred and he could not see the computer screen. Defendant contends that plaintiff's allegation cannot create an issue of fact because it is undisputed that plaintiff did not ask expressly to be excused. This is splitting hairs. If plaintiff told Cotey that he was feeling ill and was having difficulty seeing, but Cotey ignored his protests, a reasonable jury could conclude that plaintiff was not receiving the same treatment as other, substantially younger employers who were excused from taking the test.

Because plaintiff has established a prima facie case, the burden of production shifts to the defendant to offer a legitimate, non-discriminatory explanation for its actions. *Testerman v. EDS Technical Products Corp., 98 F.3d 297, 302-03 (7th Cir.1996)*. When the "burden" shifts to the employer, this "burden is one of production, not persuasion: it can involve 'no credibility assessment.' " *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000)*.

Defendant has not asserted a non-discriminatory explanation for its actions; it has only denied that plaintiff asked for a postponement of the test. Accordingly, defendant's motion for summary judgment will be denied with respect to plaintiff's age discrimination claim

### ORDER

**\*13** IT IS ORDERED that defendant Eaton Corporation's motion for summary judgment is GRANTED with respect to plaintiff Joe Thompson's claims under the Americans with Disabilities Act and the Rehabilitation Act. Defendant's motion is DENIED with respect to plaintiff's claim under the Age Discrimination in Employment Act.

W.D.Wis.,2002.
Thompson v. Eaton Corp.
Not Reported in F.Supp.2d, 2002 WL 31995670 (W.D.Wis.), 25 NDLR P 39

Briefs and Other Related Documents (Back to top)

• 3:02C00051 (Docket) (Jan. 25, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.